# EXHIBIT B

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

LYNORE I. HORN :
:
VS. : C.A. NO. 04-434-S
:
SOUTHERN UNION COMPANY, ET AL. :

VOLUME 1 OF THE DEPOSITION OF LYNORE I. HORN, the Plaintiff in the above-entitled cause, taken on behalf of the Defendant, before Carole J. Ogden, Registered Professional Reporter, a Notary Public in and for the State of Rhode Island, at the offices of Holland & Knight, LLP, One Financial Plaza, Providence, Rhode Island on September 19, 2005 at 10:00 a.m.

APPEARANCES:

FOR THE PLAINTIFF....... LAW OFFICE OF PATRICIA E. ANDREWS
BY: PATRICIA E. ANDREWS, ESQUIRE

FOR THE DEFENDANT....... HOLLAND & KNIGHT, LLP
BY: NEAL MCNAMARA, ESQUIRE

ALSO PRESENT............ DAVID BLACK
D'ANNA SOEHNGE

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920

you even have a job until the six months are up, so I was afraid if they said no, so I did a day job and a night job until the six months were up. So I even stayed then, too.
Q. Okay. So for a period of time you worked at both --
A. Jobs.
Q. -- Browning Farris and New England Gas or Providence Gas as it was called at the time?
A. Yes.
Q. You were working at Providence Gas at night?
A. Yes.
Q. Why did you apply for a job at Providence Gas?
A. Pay.
Q. Okay. Do you remember how much you were paying -- how much you were earning, excuse me, at Browning Farris?
A. No.
Q. Was there a particular job that you applied for at Providence Gas?
A. No. I didn't apply for any job, sir. In order to get into the gas company, you have to know somebody.
MS. ANDREWS: Just answer the question.
THE WITNESS: Sorry.
MR. MCNAMARA: Please don't coach the witness.



MS. ANDREWS: I'm not coaching the witness.
MR. MCNAMARA: Well, you're stopping her from answering.
MS. ANDREWS: I'm telling her to answer the questions.
THE WITNESS: What was the question?
MR. MCNAMARA: I'll keep that in mind, but Pat, please, in the future, do not interrupt your witness while she's answering the question.
MS. ANDREWS: I'm going to do what I feel that I should do, and I'll put it on the record, as I just did.
Q. How did you come to apply for a job at Providence Gas?
A. I was given an application.
Q. By whom?
A. By someone at Browning Farris.
Q. Do you remember who that was?
A. Yes. Steve Morancy.
Q. Had you discussed with him the possibility of working at Providence Gas prior to him giving you that application?
A. Yes.
Q. Do you know how it was that Mr. Morancy had in his possession a job application for Providence Gas?



A. His mother worked there.
Q. Okay. What did his mother do?
A. She worked in the kitchen.
Q. What was her name?
A. I called her Mrs. Morancy. I don't remember her first name right now.
Q. Okay. What happened after you submitted your application to Providence Gas?
A. I received a phone call.
Q. From?
A. I don't remember.
Q. Do you remember what the person told you in that phone call, whoever it was who called?
A. That I was to come in and meet Ed Bolduc.
Q. And do you remember approximately when that was?
A. '89. '88, '89.
Q. And did you come in and meet Mr. Bolduc?
A. Yes.
Q. What happened in that meeting?
A. He walked me through the building and gave me the directions of a cleaning woman.
Q. Was this meeting in the nature of an interview or not?
A. I was given the understanding I had the job.
Q. By Mr. Bolduc?
A. Yes.



Q. What did he say to you that gave you that understanding?
A. I'll see you on so and so date, and be ready to work.
Q. And so you started at Providence Gas as a cleaning person?
A. Correct.
Q. What were you making at that point?
A. I don't remember.
Q. Okay. Was it more than than you were making at Browning & Farris?
A. Yes.
Q. Was Mr. Bolduc your direct supervisor?
A. Yes.
Q. All right. And what other persons were in that same position as you at that point if you can remember?
A. Anna Collins, Rose Norton, Carol Petrarca, another girl named Morancy, but her name was Denise or something like that. I think that's it that I can recall.
Q. Was that position solely a position where the work was done in the evening and at night?
A. Yes.
Q. There was no people on a day shift for that position as far as you knew?

A. No.
Q. Okay. I'm going to ask you now, Ms. Horn, just for context to the best of your ability give me sort of a listing of the various positions you held at New England Gas until you left, you know, stopped working there last December. So if you could start in '88, '89, tell me the positions, and I may interrupt you for clarification from time to time. Okay?
A. Okay.
Q. Do you understand?
A. Yes.
Q. Okay. So how long were you in the cleaning position?
A. Until the meter reading job opened up, and I might have been there less than a year, about a year's time.
Q. During that first year when you were in the cleaning position, did that -- did the nature of the duties in that position change?
A. No.
Q. So you say you started a meter reading position?
A. That's correct.
Q. Approximately a year after you started as a cleaning person?
A. Correct.
Q. Who did you work for as a meter reader?
A. Bob Crowley.



Q. How long were you in that position?
A. Until the night watchman job came up, and I'm not quite sure the approximate time I stayed in that job.
Q. Who did you work with in meter reading other than Mr. Crowley at that time?
A. I'm not sure of your question.
Q. What other employees were in the same position that you were in while you were working for Mr. Crowley in meter reading?
MS. ANDREWS: On the same shift?
Q. On the same shift. The people you worked with?
A. It's hard to remember all the names.
Q. Well, as many as you can remember.
A. John Brito, George Magill, Richard Kayla. There were many. I just can't recall off the top of my head.
Q. Okay.
A. There might have been 20 employees. I just don't recall.
Q. During the course of the deposition, if you remember other names and it pops into your head, just feel free to tell me that you now remember something and we can just add that to the record.
A. Okay.
Q. So you said you're not sure how long you were in meter



reading at that point?
A. It was less than a year or approximately a year's time.
Q. Okay.
A. On or about.
Q. What position did you go in after meter reader?
A. Night watchperson.
Q. And how did you come into that position?
A. It was placed on the board and came down to me in seniority.
Q. Let me go back to meter reading for a minute. Were you on a day shift or a night shift there?
A. Day.
Q. You said the night watchperson position came down to you through seniority?
A. Uh-huh.
Q. Was that a situation where someone was bumped and you came into that position or --
A. No, sir. They posted the position.
Q. They posted the position and you applied for it?
A. Yes.
Q. Okay. Why did you apply for that position?
A. It was 11:00 at night to 7:00 in the morning. You got paid differential for Sunday work. Sundays you got paid extra for working weekends. Your days off



were Wednesday night and Thursday night. I knew I was going back to Ed Bolduc, but the likelihood of seeing him was slim, so I figured it was a pretty good job.
Q. Okay. Were there any other employees who worked that position at the same time you did as far as you can remember? Did you have any co-workers when you were in that watchperson or were you there alone?
MS. ANDREWS: Who were also night watchpersons?
MR. MCNAMARA: Did she work with anybody when she was a night watchperson?
MS. ANDREWS: Okay.
A. I'm still a little confused by your answer. When I was on that shift was there anybody with me?
Q. Let me clarify it then. Where did you conduct your duties as night watchperson? What building?
A. Weybosset Street.
Q. Okay. Were there any other night watchpersons in the building at the same time you were?
A. No.
Q. Or were you the only night watchperson?
A. Yes.
Q. Okay. All right. Did you relieve anyone when you came in?
A. Yes.

Page 38

Q. Who was it who you relieved when you came in?
A. The 3:00 to 11:00 shift, whoever was working.
Q. Do you remember who that was?
A. Let me think. Might have been Pat Dominicone. It might have been Jerry Porter. I don't recall.
Q. Okay. Do you remember approximately how long you were in that position as a night watchperson?
A. It's hard to say the approximate time right now.
Q. Was it more than a year?
A. I would think so.
Q. Was it more than two years?
A. No. We went to maintenance facility people. I didn't really leave the department, but the department title changed.
Q. Explain that to me then.
A. Ed Bolduc became supervisor of all buildings, so he decided to, instead of having many different titles to have one title. It was called a maintenance facility person.
Q. So you were -- your title then changed from night watchperson to maintenance facility person?
A. That's correct.
Q. As a result of Mr. Bolduc becoming supervisor of all buildings?
A. That's the best of my understanding.

Page 39

Q. Okay. Did your, even though your title changed, did your duties and responsibilities change at that time?
A. Yes.
Q. Okay. What did you start to do at that point when your title changed to maintenance facility person?
A. I had to assume some of the lesser duties like a cleaning woman again that I used to do before. When I was a maintenance person, I was just maintenance. I was working with the men in maintenance. The women were cleaning women. The men were maintenance. I was the only woman. So I had to now do some cleaning again.
Q. You just said -- I'm a little confused now. I'm hoping we can clarify this. I thought you were -- you were a night watchperson. Why don't we go back to that for a minute? Why don't you tell me what were your duties and responsibilities as a night watchperson when you worked the 11:00 p.m. to 7:00 a.m. shift?
A. You could not have the 11:00 -- can I talk? Yes? You could not have the 11:00.
MS. ANDREWS: That's why we're here.
MR. MCNAMARA: See, you terrorized her, Pat.
A. You could not have the 11:00 at night to 7:00 in

Page 40

the morning shift unless you could do all shifts I was told by Ed Bolduc. I had to prove in the three months that I was capable of doing 7:00 to 3:00 and 3:00 to 11:00 shift. They were maintenance shifts. There were no women in this department. It was all men, and in order for me to have the night watchperson job, I had to prove I could do all shifts. It was a maintenance department. It was cleaning women. There was maintenance.
Q. So when the -- when there were cleaning women and the maintenance persons, the night watchperson fell under the category of maintenance persons; is that what you're saying?
A. Yes, sir. Yes.
Q. And when you went into that position, you had to demonstrate to Mr. Bolduc that you were able to do whatever was required of any maintenance person?
A. Yes.
Q. Yes. Okay. During your daily activities as a night watchperson, what were your duties and responsibilities? What did you actually do?
A. Walked around with a clock and, you know, a key throughout the whole building to make sure the place was secure, and washed and waxed major floors of the building. That was it.

Page 41

Q. Okay. So --
A. He would give me other duties once in a while, but those were the majority.
Q. Okay. So you walked around, but you would also clean floors?
A. Um.
Q. Tell me what you'd do in order to demonstrate to Mr. Bolduc that you could be one of these maintenance persons but acting as the night watchperson. You said you had to prove to him that you could do it. Please tell me what you did to do that.
A. Many things. I could start with painting, staging, getting staging together, going to the highest point of the first floor of Weybosset Street, painting the ceiling, making sure that I could go up and down and up and down the staging. When me and a co-worker would come down, he would say, I think you missed a spot. Could you go back up the staging with a pail. I think I see a point to your left, to your right. He wanted to make sure that I could, you know, constantly making sure that I could hang off at all different types of positions off this ladder, this staging. Very critical. Painting different areas. He took me down to the cellar and did a test with me alone with 50-pound boxes. He had me lift a 50-pound

box and move it to the other side of the room and then lift another 50-pound box, and when I made a comment the first time, I said, oh, this is heavy. He said, that's why we don't want women in this department. He -- I had to take paper that was flying down a chute and paper boxes and stack them. And pipes. There were pipes on the sixth floor. Probably hadn't been cleaned in centuries, but I had to climb a ladder. They were extremely hot, and I was given very little safety equipment to clean these pipes. I was told I couldn't even have a glass of water of any kind. Nothing. I had to do cleaning the floor around the Hitachi area, the boiler area with the doors closed. It was over a hundred degrees. He said that I had to get used to working in very hot areas. If you can't handle it, you shouldn't be here. I had to work beside the men in the maintenance department in all shifts, and they told me continuously they had never worked so hard in their life.
Q. And this was all what you did to demonstrate that you could be the night watchperson?
A. Yes.
Q. What shift did you do this on?
A. 7:00 to 3:00 mostly.
Q. And how long did this period of --



A. Three months. There were -- I did go a few weeks to 3:00 to 11:00 shift, and the 3:00 to 11:00 shift was stripping floors, fixing doors, doing things like that. Opening the garage door for executives to let them out to their car. That's when I was told about -- well, that's when I found out about the executives having sex in the cars in the garage.
Q. And this was all during the period when you were qualifying, let's say, to be a night watchperson?
A. Yes. I had to do a lot more than that. That's the best of my recollection at this time.
Q. Okay. You did all this after the night watchperson position had been posted, correct?
A. Oh, yes.
Q. You applied for it?
A. Yes.
Q. So as you were doing all this on other shifts, who was filling the duties of the night watchperson position that had been posted?
A. He would take somebody from another shift.
Q. So after how many months were you then placed on the 11:00 p.m. to 7:00 a.m. shift to be the night watchperson?
A. Three months. He told me that I made it.
Q. Okay. Then subsequently when your title changed to



maintenance facility person, were you taken off the 11:00 p.m. to 7:00 a.m. shift?
A. Yes.
Q. Simultaneously with your title changing?
A. Just about. Very close.
Q. Okay. And what duties and responsibilities did you have then when you went off the night watchman shift position?
A. My first duties was to train the outside company that was taking over the job of --
Q. Of night watchman?
A. -- 11:00 to 7:00 security.
Q. That position was now being outsourced?
A. Yes.
Q. How long did you do that training?
A. A few days maybe. I don't recall. It wasn't long.
Q. Okay. Then once you finished that training of the company that was coming in to do that particular job, what shift did you work on?
A. 4:00 to midnight.
Q. And what were your duties and responsibilities in that position?
A. Mostly cleaning. It was for a very short time before I went to -- mostly cleaning.



Q. Okay. How long were you doing mostly cleaning?
A. On or approximately six months, five months. About that date, time frame. They moved me to Dexter Street.
Q. So your first position when you were a maintenance facility person was doing mostly cleaning at Weybosset Street?
A. Uh-huh.
Q. On the 4:00 to midnight shift you said?
A. Yes.
Q. Who else was on that shift, if anyone, at that time?
A. Best of my recollection is Anna Collins, Rose Norton. I think Carol Petrarca was there. I am not quite sure if Maureen Morancy was there. I'm not quite sure.
Q. Now, were there any men on the 4:00 to midnight shift at that point?
A. To the best I can remember, no, but I do remember once in a while Jerry Porter working, and I don't know if it was because someone was out. No, I don't. I don't remember any others.
Q. Okay. During that period of approximately six months when you were at Weybosset Street doing mostly cleaning, and you identified several other women who you can remember who were there as well, did each of

yours as far as you know?
MS. ANDREWS: Other than that?
MR. MCNAMARA: Other than what?
MS. ANDREWS: The fact that they had different floors.
MR. MCNAMARA: Right. Right.
THE WITNESS: Could you repeat the question?
Q. Yes. My question really is you said that Sue Green was also on the day shift as maintenance facility person. As far as you know, was there any difference in the nature of her duties and responsibilities, between her duties and responsibilities and yours?
A. Maybe I'm making more out of this than there is. I'm having a hard time understanding your question. I'm sorry.
Q. I'm just trying to understand. Was there any difference between what Ms. Green did in her area of the building as a maintenance facility person and what you did in your area of the building as a maintenance facility person when you were on the day shift?
A. Well, I had to do a lot more showers and a lot more men's rooms, and she had to do more open area, if that means anything.
Q. Right.



THE WITNESS: Is that answering your question?
Q. Was she also largely doing cleaning as far as you know?
A. Yes.
Q. But the nature of the areas you had was different, therefore, what you did was somewhat different?
A. Yes.
Q. Okay. I understand. How long were you on the day shift as a maintenance facility person at Dexter Street beginning in or about 1998?
A. I don't remember the exact time, but in 1999 I went into customer service.
Q. Was that a position that had been posted and you applied for?
A. Yes.
Q. Why did you do that?
A. Pay, but also to get out of Ed Bolduc's area.
Q. Okay. How long were you in customer service at that point?
A. It was six months, five and a half months.
Q. What did you do in customer service during that period?
A. It was a training period. It was teaching in school, and it was driving in the truck with men to



learn how to fix heaters, stoves, any gas appliance. It was testing. It was quizzes. It was electrical. It was plumbing. Everything.
Q. And who was your supervisor in that position?
MS. ANDREWS: In the position as opposed to in the school?
MR. MCNAMARA: Yes.
MS. ANDREWS: Okay.
A. Just one minute here.
Q. Take your time.
A. Dave Lauble. Sorry. Took a minute.
Q. Okay. And did you report to anybody in the school?
A. Dave Lauble was my instructor in the school.
Q. Okay. Was he also your supervisor as a person within customer service? Let me rephrase that.
A. Yes.
Q. Was there anyone else you reported to while you were in customer service in the training period other than Dave Lauble?
A. No.
Q. Who did you work with when you were in that position? You said that you were driving in a truck with men, you were learning to fix stoves, et cetera. Who were the people that you did that with?
A. Customer service men.



Q. Do you remember their names?
A. It's a long list.
Q. Well, as best you can remember.
A. Kenny Wilmont, Carl Saccoccia, Darrell Yeten. I'd need to look at a list. I just can't recall off the top of my head.
Q. Okay. And why was it that you left that position after five and a half months?
A. The company had a meeting with us that we were -- possibility of being bought out by a company that didn't consider customer service to be something that was going to be in our future. They let us know then that the likelihood of bumping was high, and if they started bumping, I was very low in seniority in the department, and that I would be out in the street digging a ditch. So they gave us the option then of going back to the job you had or taking the exam and just going for the ride and whatever happened. You had to make a decision.
Q. So your choices were to go back to the job you had or what was your other choice?
A. Or go into customer service, but you could never go back. That was it. If the bumping process started, I was going to the street.
Q. And who told you this?

Page 62

Q. Did you live in an apartment on Bellevue Avenue in Newport?
A. No. It was a house for sale.
Q. Did you buy the house?
A. No. They were selling it and couldn't sell it, so I made them an offer. I could live there and clean and live there for nothing.
Q. Okay. And how long did you live there?
A. Months. I don't know. Anywhere between eight months to a year. Somewhere in there.
Q. Where did you move after that?
A. Somewhere in there I lived in Jamestown for a month, but I moved right out because it didn't have any heating, so it was a one-month deal, but I'm not quite sure if it was before or after that.
Q. Okay.
A. And then after that I went to Warwick. Post Road, an apartment complex on Post Road.
Q. So right on the water there along Post Road?
A. Um.
Q. Was that a rental or was that a condo that you bought?
A. No. It was a rental. Harbor View I think is the name of it.
Q. How long did you live there?
A. I'm estimating a year, year and a half. It's

Page 63

approximate. I don't remember exactly.
Q. Okay. Then where did you move after that?
A. 88 Alger.
Q. Where is that?
A. East Greenwich.
Q. Where in East Greenwich is that?
A. It's right along Post Road.
Q. Is it off Main Street in East Greenwich? I live in East Greenwich, so I'm just wondering where it is.
A. Yes. It's the condominiums within walking distance of East Greenwich on Post Road. Alger is a side street.
Q. Okay. Is it north of Division Street?
A. I can't get my frame of north, south, east, or west. I'm sorry. It's in between the apartment complex I used to live in and the city of East Greenwich.
Q. Oh, okay. So is that -- it's in Warwick then, wouldn't it be?
A. I have a mailing address of East Greenwich.
Q. That's -- your zip code is?
A. 02818.
Q. Okay. You're still there?
A. Yes.
Q. Okay. All right. So after whoever this person was

Page 64

that, the head of customer service, gave you the choice that we mentioned earlier before the break, you indicated your choice was to go back to facility maintenance, correct?
A. Correct.
Q. And what did you do when you got back in facility maintenance?
A. The same job that I had when I left. First shift days.
Q. So you were on first shift, day shift. I'm sorry. The day shift at Dexter Street?
A. Yes.
Q. And Mr. Bolduc was still your supervisor?
A. Yes.
Q. Did Ms. Green still also work on the day shift?
A. Oh, yes.
Q. Okay. And were Mr. Schiano and Mr. Johnson still the carpenters as you call them?
A. Yes.
Q. Okay. Who had performed your duties on Dexter Street while you were in customer service?
A. I have no idea.
Q. Okay. Then how long did you remain on the day shift at Dexter Street in facility maintenance?
A. Very short time. I was told I was moving to

Page 65

Weybosset Street days.
Q. Was that something that you had requested or you were told?
A. Told.
Q. When you went to Weybosset Street, you were still on the day shift and you were still facility maintenance; is that correct?
A. Not quite, sir.
Q. Tell me what you were doing when you moved to Weybosset Street after you left Dexter Street at that point.
A. I was told immediately when I got there I had to get a boiler operator's license, because my position included running the Hitachi units, and I had to take a course on and get certified by the State of Rhode Island and a boiler operator's license, and if I did not get that, I couldn't keep the shift.
Q. All right. Who told you that you needed that license?
A. Ed Bolduc.
Q. So at that point you took courses to obtain that license?
A. Yes. Nights. And worked during the day.
Q. Okay. How long did it take you to obtain that license?
A. I'm not positive, but I'd say three months or so.

is no misunderstanding between us about what the facts are.
A. Yes.
Q. Ms. Horn, you have described to me in some detail what your responsibilities were with respect to the Hitachi unit, heating and cooling, painting, fixing door knobs, fixing elevators, et cetera.
A. Yes.
Q. When you were on the day shift at Weybosset Street after you got your boiler operator's license.
A. Right.
Q. I just wanted to find out how long did you hold those duties and responsibilities before there was a change, whether there was a change within facility maintenance as to what your duties and responsibilities were or you left facility maintenance?
A. So you want a time limit? You're looking for years? Is that what your answer is?
Q. Yes. If you have that.
A. Okay. Approximately around two and a half years I think. Between two years and a little more approximately.
Q. Okay. And during that two to two and a half-year period, is it correct that you performed the duties and responsibilities you've described and you worked



often with Jerry Porter in terms of the maintenance of the heating and the cooling unit?
MS. ANDREWS: Objection as to form, but go ahead.
A. Absolutely. Yes.
Q. Did you work with anyone else with respect to the heating and cooling units other than Mr. Porter during that period?
A. Gary Sunday when he finally came in as boss.
Q. That was after Mr. Bolduc left?
A. They worked together for a few months, and then he left, yes.
Q. Okay. During this period when you went back to facility maintenance, you got your operator's license, you worked with Mr. Porter, you've described your duties and responsibilities. Who else was on the day shift other than you and Mr. Porter?
A. That's it.
Q. Okay. Were there duties and responsibilities you performed during that period that you did not perform along with Mr. Porter, that you performed on your own?
A. A few.
Q. Okay. Please tell me what they were to the best of your recollection.
A. If they ran out of cups in the kitchen and they



needed boxes brought up from the cellar, and I would refill the cabinets for the people. If they ran out of paper towels in the kitchen and they needed several boxes brought up, I would bring them and refill them. Sometimes I changed light bulbs by myself if it was a one-person area, depending on the height of where they were and danger. I would paint areas alone if, you know, if it was a safe condition, that type of thing, and unload trucks. Sometimes a truck would come in. If he wasn't there, of course, I had to unload it, you know.
Q. Now, you said earlier that Mr. Bolduc had decided not to talk to you --
A. Um.
Q. -- during that period. To your knowledge do you know why he made that decision?
A. It starts back at the beginning, sir. We've had trouble since the day he first said hello.
Q. Well, we'll get back to that then. Did he communicate to you at that point any particular reason in this particular time frame why he was not communicating with you directly as you stated?
MS. ANDREWS: Objection as to form. Go ahead. You can answer.
A. He said he was terribly disappointed to see me



come back after customer service.
Q. Did he say why?
A. Not really.
Q. Now, once Mr. Sunday came to facility maintenance, and let's say after Mr. Bolduc was completely gone, so it was just Mr. Sunday as your supervisor, did your duties and responsibilities remain the same as you were working for Mr. Sunday?
A. Yes. I'd have to say they pretty much did.
Q. Was it still the case that you and Mr. Porter were the only people on the day shift?
A. Yes.
Q. Okay. At what point after Mr. Sunday became your supervisor did your duties and responsibilities change?
A. When I was told of the bumping process. When I had to move on to the next job.
Q. Okay. And you were in facility maintenance when you were told that you needed to engage in the bumping process?
MS. ANDREWS: Objection as to form. Go ahead.
A. I was in the boiler operator position, yes.
Q. Okay. What was the next position you went into after you were told that you needed to engage in the bumping

Page 74

process?
A. Meter reading.
Q. How long were you in the meter reading position?
A. For eight days.
Q. Who was your supervisor in that period?
A. Frank Lisi.
Q. Where did you go after meter reading?
A. Leak survey.
Q. Do you know why you were in meter reading for only eight days?
A. They called me and said a job came down to me.
Q. Who called you?
A. A job posting came down to me.
Q. What does that mean, a job posting came down to you?
A. It means that I had signed for a job and everyone above me didn't want it, so it had come down to me. Do I want the job.
Q. So does that mean that you had expressed an interest in a leak survey job and now it was available?
A. It means that when I heard of the bumping process I signed for every job that could possibly be, and that job came down to me. It doesn't mean I had an interest. It just means that I --
Q. But you had signed up for it?
A. Yes.

Page 75

Q. Had you similarly signed up for meter reading?
A. I don't remember if they had an opening for meter reading.
Q. How was it that you went from facility maintenance to meter reading?
A. I received a letter in the mail saying I was being bumped.
Q. Okay. You were told that you needed to go into meter reading?
A. No. I was told there was a list of everyone below me. I had to choose a position to go into.
Q. And you chose what position?
A. I chose drafting.
Q. Okay. Did you go into drafting?
A. No.
Q. Do you know why?
A. I was told by Bud Butler I couldn't have it.
Q. What did Mr. Butler say?
A. I told him I wanted the drafting job, and I told him that I had taken drafting in college. I told him that I had worked out on construction sites with drafting paperwork, and I told him I was more than willing to go to school nights to take any courses it took to get caught up to this position. May I have the drafting job? He said, no. He said, you've never

Page 76

done drafting at the gas company. He said, therefore, you cannot try it at all.
Q. Okay. So how was it then that you came to be assigned to meter reading?
A. Then I chose customer service. I told him I had been in customer service for five and a half months. I told him I had passed every single test in electrical, plumbing, everything. I told him that I took the physical exam by a supervisor who watched me fix appliances that passed me that said I did an excellent job, but I didn't take the written test. I asked him during that ten days to allow me to take the written test and allow me to go into customer service.
Q. And what did he say?
A. Absolutely not.
Q. Did he say why?
A. We don't make exceptions for you, Lynore.
Q. What was the exception that you were looking for?
A. I don't know. I didn't think it was an exception. I think it says in the paperwork I get ten days to try to do a job, and I wasn't asking, but he didn't want me to have it.
Q. Did he say why he didn't want you to have it?
A. He told me firmly at that time to be a clerk. There was a clerk's job opening. I want you to be a

Page 77

clerk.
Q. Did he say why he wanted you to be a clerk?
A. That's what I should be is a clerk.
Q. Did he say why?
A. No. But I told him at that time I had never been a clerk at the gas company. I've never done filing or typing in my life, so if I can do that job, why didn't I take the drafting job? And his response was, you can be a clerk. I said, well, I've been a meter reader before, and I passed and I was in meter reading. Can't I do meter reading? And he was stumped. He said, I guess you can, and he slammed the door and walked out.
Q. Where did this conversation take place?
A. Human resources.
Q. Were you in a conference room?
A. In his office I guess or someone's office.
Q. So he -- he slammed the door and left the office and left you in the office?
A. Yes.
Q. So you went to meter reading?
A. Yes.
Q. And then after eight days you were notified another position had opened up that you had signed up for?
A. Yes.

Q. Okay. Approximately when did you go into leak survey?
A. I'm going to say on or approximately the end of year 2002, to the best of my knowledge at this time.
Q. Okay. Who was your supervisor when you went into leak survey?
A. Cliff Ritcher.
Q. What other employees were there in the leak survey department at that point other than you and Mr. Ritcher?
A. Merle Dean, Donald Clements, Jim Dawley was coming in, and Barbara Alderman came in later.
Q. Was Elliott Kemp there at that time?
A. Yes, he was. Thank you. I forgot him.
Q. Were there any other individuals there when you arrived other than Mr. Dean, Mr. Clements, and Mr. Kemp?
A. Not to the best of my knowledge.
Q. Okay.
THE WITNESS: On the very first day that I arrived?
Q. That's what I'm asking, yes. You say that Mr. Dawley and Ms. Alderman came in after you did?
A. Yes.
Q. Was that to your knowledge part of the bumping process?



A. I really don't know.
Q. There was a -- strike that. Was there a Mr. Langsford in leak survey?
A. He came in later also.
Q. Came in later also. Now, when you arrived in leak survey, what was your understanding of the nature of the duties and responsibilities?
A. Very little.
Q. Okay.
A. I mean, I just knew I had signed a piece of paper saying leak survey.
Q. Okay. Did you receive any training?
A. Yes, I did.
Q. Why don't you tell me what the nature of the training was that you received when you got into leak survey?
A. They brought a company in to train you on the FI units and the CGI units, and they certified us and tested us and took us out in the field.
Q. This was an outside company you said?
A. Yes.
Q. Do you remember the name of that company?
A. No. I just can't recall it off the top of my --
Q. How long did this training process conducted by this outside company last?
A. I'd say two weeks maybe approximately, to the best



of my knowledge.
Q. Okay. Who was -- strike that. Were you the only person being trained at that point or was there --
A. No. No.
Q. Who else was involved in the training process in terms of receiving training?
A. Anybody who was coming into the department received this training.
Q. Okay. So was --
A. We all had to take the same quizzes, the same tests equal, yes.
Q. Was Mr. Dawley there at this point?
A. Yes.
Q. Was Ms. Alderman there by this point?
A. I'm not quite sure.
Q. Okay. Was there anyone that you can remember other than Mr. Dawley and yourself who was in this training program?
A. We had two people come in for a brief short time and they left, and I just don't recall their names at the top, and when they left that's when Barbara Alderman and Mr. Langsford came, so I don't quite remember how long they stayed or when the other ones picked up.
Q. After you had completed this training program, what



was your understanding of the work that leak survey did, the department as a whole?
A. It was driving and walking survey, finding and reporting and updating the leaks of all the Providence Gas area.
Q. Did you receive any on-the-job training from the other individuals who worked in leak survey?
A. Yes, I did.
Q. Okay. What was the nature of that training?
A. What do you mean by nature? I'm not --
Q. Well, you said yes when I asked you if you had received on-the-job training. You said that you did?
A. Yes.
Q. What kind of on-the-job training did you receive? Did you go in the field with them or what?
A. My difficulty with answering your question, sir, is that I think the company meant me to go out for training, but the person didn't do anything, so I don't know how you want me to answer that.
Q. It's not a question of how I want you to answer it. It's who was the person who you said did not want you to get training?
A. Oh, it's not that they didn't want me to get training. His name was Merle Dean, and when you go out for a week with him, it's nothing job related.

It's -- bars, sex, women. It's every gross tale. You drive around to his bank. You drive around to some bar that he went to the night before because he has to cash out and tell you about every drunk that was there. You are told to go with him to learn this job, but you don't do any job, and when you get in at the end of the day, the boss asked how you did, and he grades you on how you handled his sexual comments from the day.
Q. Who grades you?
A. Merle Dean.
Q. And who was the boss who you just referred to?
A. Cliff Ritcher.
Q. You were assigned to go with Mr. Dean by Mr. Ritcher?
A. Yes.
Q. Did you complain to Mr. Ritcher at this point that you were not receiving the training that you were hoping for?
A. Yes.
Q. What did you say to him?
A. I told him that it was difficult being with him during the day, and he gave me someone else for one day and then sent me back, but then I went out to C & M, construction and maintenance --
Q. C, ampersand, M.



A. -- for training.
Q. How many days initially were you on this on-the-job training with Mr. Dean where --
A. Three days.
Q. Three days?
A. And the boss didn't think much of my complaint.
Q. But he switched you to another person?
A. Yes.
Q. Who else did he switch you to at that point?
A. Donald Clements.
Q. Okay. And did you receive on-the-job training from Mr. Clements?
A. Yes.
Q. Did he engage in the same activity on the job that Mr. Dean did?
A. No.
Q. Your received one day of training with Mr. Clements?
A. I did. I did go back in the future, but at this time, yes.
Q. Okay. Again, at this point, I'm still trying to sustain time frames. Let's go back for a second. You went to leak survey?
A. Yes.
Q. At what point did you receive the two-week program of training that we discussed a minute ago? Was it



immediately or sometime after you started in leak survey?
A. Oh, you're saying the training from the outside company, sir. Is that what you're talking about?
Q. I'm going back to that right now for a minute.
A. That was after I went to C & M for three weeks. Construction and maintenance for three weeks.
Q. Okay. Let me go back then. You started in leak survey?
A. Yes.
Q. And what was the first thing you did there for, say, the first week?
A. One day it was just filing. The boss didn't know what to do with me, because there was nobody else there. I was the only one that had arrived, and then I was put with Merle Dean for two to three days and then one day with Donald Clements, and I pretty much was gone. I mean, the best I can remember, it happened like that. I was told to go to construction and maintenance.
Q. Okay. So it sounds like you were in leak survey for about two weeks at that point, and then you went to construction and maintenance; is that accurate?
A. Approximately.
Q. Who told you that you were going to construction and



maintenance?
A. Bud Butler met me at the end of the hallway when I left meter reading on my eighth day, and he had a piece of paper in his hand, and he was wagging the piece of paper, and he said to me, do you realize that you just said yes to a job? Did you read all the fine print of that job? And he was smiling and laughing, and I said, no, I don't know anything about the job. He says, you have to complete construction and maintenance work. Do you realize that? And he said it's -- if you don't pass, you'll be fired, because you have nowhere to go back to. You did not finish your ten days in meter reading. I told him, may I go back to meter reading now and finish those two days and then leave and take the leak survey job? He said, absolutely not. You are going to leak surveying, and if you don't pass C & M, you will be fired, and that was when I heard about C & M.
Q. So what did you have to do in C & M?
A. C & M was construction and maintenance. It's everything from digging a ditch to using jack hammers to putting pipes in the ground, putting new sets up for customer homes. It's construction and maintenance.
Q. Okay. And who did you report to in customer -- I'm

1994.
A. When I went to meter reading, Bob Crowley was very upset that another woman would want to come into his department.
(MS. SOEHNGE RETURNS TO ROOM)
THE WITNESS: I didn't say this already, did I? I feel like I'm repeating.
MR. MCNAMARA: I don't remember you talking about this.
MS. ANDREWS: I don't think you mentioned this.
THE WITNESS: No? Okay.
MS. ANDREWS: Are you okay to go on?
THE WITNESS: Yes.
MS. ANDREWS: Okay. Because neither one of us wants you if you get too tired.
THE WITNESS: Okay.
Q. What did he say?
A. He said he didn't want another woman in the department.
Q. Did he say that to you?
A. Yes. I was in the interview for the meter reading job, and he was very upset he was facing another woman in this department.
Q. Who was the woman who was already in the department?



A. Tina and Nicky were already there. He had two women.
Q. How many people were in the department total as far as you know?
A. I can only approximate, but somewhere between 15 and 20. Maybe a little more. He went on to say, it's a dirty job. It's filthy. It's gross. There's rats. I told him that I had horses and I cleaned out horse barns. He said, it's a lot of walking during the day. It's constant walking. You'll never stop. I told him that I ran cross country and track, and I was number one in the state. He said, you're going to be alone. There's going to be unsafe conditions for you. There's going to be sometimes -- I said, is it going to be any different for the men out there? He said, it's equally unsafe. I said, I'd like to try the job, sir, for three months. He gave me the job, and the only thing I can tell you is many times I got comments from him and they were comments in surprise like, you did the route and you finished? Very surprised that I could do it.
Q. Did he ever compliment you?
MS. ANDREWS: Objection as to form.
A. He did one time. I was given credit and collections for the day to do credit and collections,



and he told me he never saw anybody collect so much money ever. At that time you could collect cash, and they gave you no training. Just gave you a bunch of names and houses and said, go collect money, and he said, I never saw anything like it, and that was it, but during that episode in meter reading is when I met a man named Richard Kayla. Richard Kayla was a meter reader in the Union who on this one particular day I had to drive with him. There was always a senior person driving, and then two or three of us were dropped off. That's the way it was handled years ago. Richard Kayla was in the same car as myself. They were dropping me off in Barrington, right on the water, and you could see Warren right across the way, and Richard Kayla said, I know that man who lives in that house. I've known him for years. I said, what house? And he pointed to it, because that was the house I had lived in for five years, six years, and I said, I know Dale Cunard who lives in that house, which was the gentleman I lived with, and I said, that's funny. I lived with that man for six years. I never met you a day in my life. But I said, I guess if you're good friends with him. He said, oh, I knew him from whatever. So a few days or whatever, some time elapses. I don't know exactly how much, and



Richard Kayla comes to me and says, I'm going to bring a bottle of wine to your house tonight. You and I are going to get to know each other better. I said, no, we are not going to get to know each other better. I have no interest in getting to know you, and you're not going to bring a bottle of wine to my home, and he was very aggressive. He was very persistent. He got to be rude. I'll be there. He wouldn't stop. So I went immediately to the steward, George Magill, and I said, George, I am not sleeping all night long next to my door in fear of this man coming to my house. I do not want him to come to my house, and I'm asking you to please go out and talk with him sternly and tell him to stay away from my home, and he did, and Richard Kayla never arrived, and the next day I got on the phone, and I called Mr. Cunard who I lived with, and I said, do you know a man named Richard Kayla? He said, yes, I do. Well, first he said, I'm not quite sure. Wait a minute, and he said, now that you mention it, I know his daughter. His daughter Laura used to place with his daughter. The two girls played. He said, I don't know the man other than his daughter. But then he said, Lynore, I'm going to tell you something. I only want it to go so far is that I heard he molested his daughter. I heard that he's aggressive. I heard