# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LYNORE I. HORN | : | |
| | : | C.A. NO: 04-434-S |
| VS | : | |
| | : | VOLUME II |
| SOUTHERN UNION COMPANY, | : | |
| et al | : | |

DEPOSITION OF LYNORE HORN, a witness in the above-entitled cause, taken on behalf of the Defendants, before Paula J. Campagna, a Notary Public in and for the State of Rhode Island, at the Law Office of Nixon Peabody, LLP, One Citizens Plaza, Providence, Rhode Island 02920, on April 10, 2006, at 10:12 A.M.

APPEARANCES:

FOR THE PLAINTIFF........LYNORE I. HORN, PRO SE

FOR THE DEFENDANTS.......NIXON PEABODY, LLP
BY: NEAL J. McNAMARA, ESQUIRE

Also Present: David L. Black
Matthew J. Frankel, Esquire

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500
www.alliedcourtreporters.com

Page 146

A. Anna Collins.
Q. What about Anna Collins?
A. Just didn't want me using the sweeper. We ended up being told we couldn't use it.
Q. Who's we?
A. Sue Green and I, at the end.
Q. On September 2nd on the top it says, "Called Jim. Personal lawyer." What is that referring to?
A. I don't know.
Q. Did you have a friend named Jim that gave you the name of his personal lawyer?
A. No, but I've dated lawyers, so I'm wondering if it was a person that I was dating.
Q. You didn't see a lawyer around this time about your employment?
A. No. A lot of my friends were graduating, and I don't know if it was this year or the year before, from law school. And there were a lot of law school parties. And when they finished their bar, there were parties, and that type of thing. And I was lucky to be invited to a lot of those.
Q. September 4th. Toward the bottom it says, "Sue used machine. He told us not to use machine

Page 147

outside. Special rules for her." What does that mean?
A. He said the sweeper was not to be used, and then there was a pile of dirt that landed in Dexter Street, a huge pile of dirt, and when Ed Bolduc saw me, he told me to grab a broom, a shovel, and a wheelbarrow, and go out and pick up the dirt. I picked up as much as I could. And when Sue came, I don't know if she was late that day, or whatever, she went out and grabbed the sweeper and had it all swept up. She said Ed told her she could use the sweeper. I told him, Next time either I'll use the sweeper or next time give her the job.
(DEFENDANTS' EXHIBIT I MARKED FOR ID)
Q. Is that an e-mail you sent to Ed Bolduc on September 4th, 1998, regarding the sweeper?
A. Yes.
Q. Did you, towards the bottom, use the phrase, "Nigger. I am not"?
A. Yes, I did.
Q. Why did you do that?
A. Because that's how he was treating me.
Q. Do you use that phrase often?
A. No. A boss can't Street one worker

Page 148

differently than all the rest. He was just mad because I didn't go to him over the gun incident.
Q. You think using the word "nigger" is an appropriate word to use there?
A. No, it's not ever appropriate.
Q. But you used it?
A. But it made a statement.
Q. It certainly did. "Men upset from crews outside job." Who is that referring to?
A. Construction and maintenance crews. It might have been a rain day.
Q. So was this language that you happened to hear them using?
A. Yeah. And the word "drunk", so that usually means -- a lot of times they would go to a bar and drink on rain days.
Q. Was this language directed at you, or you just simply heard it?
A. I can't recall at this time.
Q. Do you remember this incident?
A. No.
MR. MCNAMARA: Do you want to take a break.
THE WITNESS: Okay.

Page 149

(SHORT BREAK 3:35)
Q. Lynore, in 1999 you went into customer service?
A. I would say that's correct.
Q. Why did you do that?
A. There was a job opening.
Q. You went into customer service school; is that right?
A. Yes.
Q. Why did you choose to do that, is my question? Was there a particular reason you wanted to go into customer service?
A. I don't have any reason at this time.
Q. Do you remember having one at the time, but you just can't remember right now?
A. No. It was a job opening. And I think it might have been a pay increase, but I'm not quite sure. New boss. New field.
Q. Why did you leave customer service school?
A. The gas company was being sold, and they told us that customer service -- there was a very good chance of deleting all of the customer service or bringing it down to a small number of people. They wanted to be honest with us because we were low in seniority and we would be bumped first. And if we were bumped -- once you

took the exam and went into the department, that means you went to construction and maintenance.
Q. Who told you that?
A. They had a special meeting with us. The head of customer service at the time. Frank Devlin was there. I just can't recall. It was just the customer service school people. It wasn't anybody else. It was just people in school.
Q. Was there anybody else who left customer service at the same time you did?
A. No.
Q. You left because why?
A. I knew that I couldn't dig a ditch for a living.
Q. You were afraid of going to --
A. Construction and maintenance. And the pay for construction and maintenance was at least a $6 an hour drop in pay. And I knew I couldn't pay my bills with that.
Q. It was Frank Devlin who made this announcement to you?
A. No.
Q. Who did?
A. I don't recall his name. He was the head of



the Customer Service Department at the time. I don't recall his name right now.
Q. He was the head of customer service at the time?
A. Yeah.
Q. Was there anyone else with him?
A. There were about four supervisors. Dave Lauble was there, Frank Devlin was there, and two others. I know he was the head of customer service, but I'm blank right now on his name.
Q. Your card of your work history at New England Gas. You went into customer service May 10th, '99 and transferred out on October 24th. How much time prior to October 24th was this meeting that you're referring to when the announcement was made?
A. I don't know exactly.
Q. And that was the reason you left customer service, because you were afraid of going to construction and maintanence if what was predicted would occur?
A. Yes. If it happened, yes. And they told us about the buy-out of Southern Union, and they went on to quite a speech that convinced me that they had good reason to get rid of those people.



Q. Your option then from customer service would be to go back to the job you had before?
A. Correct.
Q. Ed Bolduc was still your supervisor there?
A. Yes.
Q. Were you still on days at Dexter Street at that paint?
A. For a very short time.
Q. About how long?
A. I don't know exactly.
Q. A matter of weeks or months?
A. I'm not quite sure.
(DEFENDANTS' EXHIBIT J MARKED FOR ID)
Q. Exhibit J. This is an e-mail. It was forwarded from Ed Bolduc to Bud Butler. But below that is a message from you to Ed Bolduc. Do you recognize this e-mail?
(WITNESS PERUSING DOCUMENT)
A. I don't recall this.
Q. Do you deny sending this e-mail?
A. No. I'm saying I don't remember it.
Q. Do you remember the paragraph that says, "Ray...Sue causes trouble in this department every day...she is Ed's pet. She gets treated better than any employee in this department and



does nothing for work...she is hated by this department...gets away with murder...she does not do her job...Ed refuses to hear it...we are at war. I am asking you to understand that if she gets one penny from this...we will handle her in another way. I will not take much more." What are you referring to here?
A. I can't recall the letter.
Q. But you don't deny that you sent it?
A. It has my name on it. I just don't recall it.
Q. Did you ever feel at any time that you can remember, why you were at war with Sue Green?
A. I don't think war is an appropriate word. She had a relationship with Ed and was treated a lot better, and Lynore was treated not well at all by Ed. Ed made it perfectly clear he didn't like me. And I just don't remember this letter.
(DEFENDANTS' EXHIBIT K MARKED FOR ID)
Q. This is a document that you produced to us in discovery. I'm wondering what it refers to?
A. A license plate, a Massachusetts license plate was following me.
Q. What do you mean following you?
A. I had several cars following me. This was