# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LYNORE HORN, Plaintiff<br><br>v.<br>SOUTHERN UNION COMPANY and<br>NEW ENGLAND GAS COMPANY,<br>Defendants. | :<br>:<br>:<br>:<br>:<br>: | C.A. NO. 04-434-S |

AFFIDAVIT OF CLIFFORD J. RICHER

Clifford J. Richer being duly sworn, deposes and says:

1. I am Supervisor of Facility Locating and Leak Survey ("Leak Survey") for New England Gas Company. I submit this Affidavit in support of Defendants' Motion for Summary Judgment. The facts set forth herein are based upon my personal knowledge. Attached to this affidavit as Exhibit A is a document dated 12/25/04 summarizing overtime in the Leak Survey department for 2004.

2. On or about September 15, 2002, Lynore Horn ("Horn") began working in Leak Survey. I was her supervisor throughout her employment in that department.

3. Horn and her co-workers in Leak Survey were responsible for responding to and monitoring suspected or reported gas leaks throughout Rhode Island.

4. Leak survey is conducted by either walking survey, i.e., the leak surveyor gets out of the survey vehicle and monitors leaks while walking and using a hand-held monitoring device, or driving survey, i.e., the leak surveyor drives very slowly through the survey area using a leak monitoring device that is attached to the survey vehicle. Consequently, leak surveyors spend the vast majority of their time in the field.

5. Newcomers to leak survey were generally assigned walking survey, while driving survey was generally given to the more experienced employees within the department.

6. I assigned a comparable amount of walking surveys to Horn and the other employees, including James Dawley and Barbara Alderman, who came into the department at approximately the same time as she did. Dawley and Alderman entered Leak Survey in the fall of 2002.

7. Leak Survey employees are required to have the training and ability to assist the Construction and Maintenance ("C&M") department at times. Horn had no C&M experience, and Alderman had not successfully completed previous C&M training. Therefore, both Horn and Alderman received C&M training after arriving in Leak Survey. Dawley did not need to receive C&M training after arriving in Leak Survey because he had previously successfully completed C&M training.

8. At the time Horn arrived in Leak Survey, the department had four of its own vehicles and eight leak surveyors.

9. Also at the time that Horn arrived, three of the four Leak Survey vehicles were already assigned to the three long-time leak surveyors, Merle Dean, Donald Clement and Elliot Kempe.

10. Because Leak Survey has had more leak surveyors than vehicles since my arrival in 2002, we periodically borrow vehicles from other departments, on a temporary basis, so that each employee may have a vehicle. I have always assigned vehicles to the newcomers in Leak Survey, including Dawley, Alderman and Horn, on an ad hoc-as needed basis, not by seniority.

11. Many of the vehicles that Leak Survey borrowed were older and at times lacked heat and/or air conditioning.

12. I was responsible for assigning overtime work. In determining who would be assigned overtime, I generally followed the overtime list. That list, which was generally updated

on a weekly basis, set forth the number of hours each Leak Survey employee had worked year-to-date. It also stated whether the employee was on leave or on "light duty" and therefore should not be called for overtime. I would call the "low overtime" person, i.e., the person who had logged the least number of overtime hours year-to-date and was not listed as "do not call," as required by the collective bargaining agreement.

13. However, due to the nature of gas leaks and similar emergencies, I would, if necessary, call the person in the field closest to the site or, alternatively, a person with certain experience necessary to deal with the situation at hand.

14. In no way did I discriminate against Horn, or women in general, in the assignment of overtime work.

15. At times, I referred to Horn as "One-Oar", in a casual, joking manner. I never referred to her as "Blondie".

16. I referred to Horn as "One-Oar" only after Horn and Merle Dean returned to the department laughing after a breakfast during which, they told me, the waitress had mistaken the name "Lynore" for "One-Oar." She never objected and indeed referred to herself as "One-Oar".

17. I did not know that Horn was upset by the nickname until I was alerted in June 2003 by my superior, Mike McGuire, that Horn had complained to him about my use of the nickname. I immediately apologized to her, told her that I wished she had informed me that this bothered her, and stopped using the nickname .

Clifford J. Richer

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

Subscribed and sworn to before me this 29th day of June, 2006.

Paula K Jordan
Notary Public
My Commission Expires: 6/20/09