# EXHIBIT J

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

LYNORE HORN

vs. C.A. No. 07-142S

SOUTHERN UNION CO. and
NEW ENGLAND GAS CO.

DEPOSITION OF LYNORE HORN, the Plaintiff in the above-entitled case, taken on behalf of the Defendants, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Nixon Peabody, LLP, One Citizens Plaza, Providence, Rhode Island on January 8, 2008 at 10:00 A.M.

APPEARANCES:

FOR THE PLAINTIFF........BY: LYNORE HORN, pro se

FOR THE DEFENDANTS.......NIXON PEABODY, LLP
BY: NEAL J. McNAMARA, ESQUIRE
-and-
JILLIAN FOLGER-HARTWELL, ESQ.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

discuss is what we were talking about just before we started the deposition, which is the request for records that we made to Dr. Holly Tytell; who is Dr. Tytell?
A. She's my doctor.
Q. You see more than one doctor right now; is that correct?
A. Yes.
Q. What do you see Dr. Tytell for?
A. I was told by Butler Hospital to see her after being admitted to Butler Hospital, and she's my doctor, she's a psychiatrist. She gives me medication, but she also talks to me as a doctor.
Q. How long have you seen Dr. Tytell?
A. Since my last stay at Butler Hospital.
Q. How often do you see Dr. Tytell?
A. I had cut back visits only because of money. She wanted to increase the visits and I could not afford them. I see her whenever I can. I have to have $80 cash in order to see her. I don't always have the money, and she will not see me even if I have $60, she won't see me. But I see her as much as I can, as much as I can afford to.
Q. Over the last year, can you tell me approximately how many times you think you've seen her?

and I told them how I couldn't breathe and that I wanted to call for an ambulance that day because I was so bad and because there was so much going on with her -- I couldn't see her. Again, I just knew I had to stay away from that. I felt if I called the ambulance they would have came in the same door and I just didn't want -- so I just stayed in a corner in the basement and I was just so scared, and I know she was put on leave after that for quite some time.

Q. Were there any other occasions that you're aware that Barbara Alderman brought a gun to the gas company?

A. December 7, 2004.

Q. We know about that, we'll talk about that in more detail, but beside that December 7th and the date you just told us about where you say she was going to try to kill Ms. Soehnge, are there any other dates you're aware of or circumstances that you're aware of that she brought a gun to the gas company premises?

A. No. I heard a gun was pointed at her, though.

Q. Who did you hear that from?

A. Frank Devlin -- I heard from the union, and

break.

(RECESS)

Q. Ms. Horn, why don't you tell me as best you can remember what happened on December 7, 2004 in lead survey in the morning?

A. I arrived at the gas company and I had the dry heaves every morning. I got out of my car and feel like I had to throw up. I was always sick. I was nervous, shaking. It was very rough that day. People were fighting in the hallway when I arrived, union guys were having an argument. In order to punch in, I had to go around people punching each other, slamming each other. The swearing was really bad. I went down to the bathroom before I went upstairs to lead survey and I was shaking a lot. I had gotten pushed a little bit.

Q. Who had pushed you?

A. Two guys having a fight, and I don't know exactly which one. I went upstairs and Barbara Alderman was talking about how much you need a gun on the job.

Q. Where were you when she was saying that?

A. When you walked in, our department was right there in the door, it was when you opened the

got to stop. One day she said it's like a full-time job protecting you. I said, I know, thank you. That's when she said -- she had brought a gun into the gas company and I told her then how much it bothered me, the gun because of what happened to me in 1994, and I think that's why on 12-7 she had the gun because she knew I wouldn't be able to breathe. I had told her on that day that I couldn't breathe.

Q. So, on December 7 you have told us some of what happened then. When last we were talking about December 7th you said that you came back from talking to Mr. Richard or from leaving him some documents, and that she was still there, I think that was -- you said that was unusual and everybody else was gone?

A. Yeah.

Q. So what happened then?

A. It was very quick, but she moved a hand like she was going to gesture something, very tough. She had a very unusual face and then she took a gun and pulled it out. She didn't point it at me, but almost. It was just for a minute, it was just a second. I couldn't breathe.

Q. Where was it?

A. It was in her jacket, in the side.

Q. Did she just pull it out so you could see it and then put it back?

A. I don't remember if she put it back, I couldn't see it after that.

Q. You said she pulled it out but she didn't point it at you?

A. If she did, she did for a second, I just can't recall. I saw the gun, and all I can tell you is physically I fall apart.

Q. So then what did you do -- strike that. Did she say anything to you at that point?

A. When this happens to me, I can't hear too well, my breathing shuts off and my eyes, I just fall apart. The gun just makes me fall apart, and I can't even tell where I am. I remember I had to get air.

Q. So, what happened then?

(MS. FOLGER-HARTWELL ENTERED AT THIS POINT)

A. The next few minutes are blurry, I just had to get air.

MR. McNAMARA: Just for the record, Jillian Folger-Hartwell, she's an associate working on the case. I don't know if you've met each other before.

A. Yes.
Q. And you were there as an inpatient for some period of time, it was probably a couple of weeks?
A. I was a patient, yes.
Q. What do you remember of your stay at Butler as an inpatient, not later when you were coming in just for the day.
A. Very calming environment, they don't allow any degrading of people. They're not even allowed to say you have a nice dress because it might put another woman down. They are very thoughtful, constant -- very safe. I don't remember much except for that, except I felt safe for a while. I was scared to death, and I told them that. Scared for my life.
Q. When you left there, you were still seeing Dr. Marzilli?
A. Uh-huh.
Q. And is that when you started seeing Dr. Tytell --
A. Yes.
Q. -- for the period after you left. So, let's start in January of '05, what was your daily ability to function. Why -- at first let's just say January '05 until June of '05, so the first half of the year.

that with him?
A. To tell you the truth, no. And I can't read that at all, I'm sorry.
Q. Well, did Dr. -- in or about December of 2005, did Dr. Marzilli tell you whether or not he thought you could go back to work?
A. Not to.
Q. He told you not to?
A. No.
Q. What did Dr. Tytell tell you about going back to work in or about December 2005?
A. I don't recall her exact words, but my feeling right now is that neither one of them wanted me to go back to work at that time.
Q. And did they tell you that you couldn't go back to that particular job, or that you simply should not go back to any position?
A. My feeling is if it was a safe environment, if changes were made, and if they could find something that no abuse would happen, maybe I could do it. But we didn't know where that was. Dr. Marzilli had already sent me back letting them know I was being abused and they did nothing for me, and it got worse. And he was scared to send me back to the same environment.

during the depositions, I think he would have been slightly fair to me.

Q. There were no union positions that you had suggested as an alternative; is that correct?

A. I'm just skimming it, it doesn't look like I said anything in the letter.

(PAUSE)

A. It doesn't look like I wrote anything in the letter about that. They didn't write me back on any union jobs or management jobs or any job. It was a ridiculous letter, but I was in a ridiculous state of mind.

Q. What do you mean by a ridiculous state of mind?

A. I was medicated, scared, not really taking care of myself, and I knew I was losing my health care and any chance of going back, but there was nothing I could do.

Q. Had you discussed this -- had you discussed this letter with either Attorney Andrews or Attorney Iafrate?

A. I don't remember.

Q. The last letter in Exhibit C is dated December 7 from D'Anna Soehnge to you. Do you remember getting that letter?

A. To be honest with you, no.